[PHILADELPHIA, MARCH 29, 1833.]

The BANK OF PENNSYLVANIA *against* M'CALMONT and Others, Assignees of STRAWBRIDGE.

*A.* drew a note for thirteen hundred and fifty dollars, for the accommodation of *B.,* dated 21st of *August,* 1822, payable sixty days after date to *C.* or order, who endorsed it for the accommodation of *B.,* who after endorsing it himself, got it discounted at the Bank of *P.,* where he received the proceeds of it.   *B.* by his agreement with the drawer and payee of the note, was to pay it at maturity.   Before this time arrived, however, *B.* failed, and on the 13th of *September,* 1822, executed an assignment of all his estate to trustees, for the benefit of his creditors, on certain conditions, one of which was, to pay and discharge all the debts that were by him *then due,* or *were owing,* or *growing due,* to such of his *creditors,* as should within the space of ninety days, after the date of the assignment, if residing within the *United States,* and within six months, if residing elsewhere, execute a general release of *all demands* and debts whatsoever against him, paying such creditors their debts in full, if the estate should be sufficient for that purpose, and if not, paying them in equal and rateable proportions, according to the amount of their debts respectively.   The assignor furnished to his assignees a list of his debts, including the note in question.   On the 14th of *September,* 1822, *A.,* the drawer, having also failed, executed an assignment of all his estate to trustees, for the benefit of such of his creditors as should within thirty days from that date, execute a release of their claims against him.   These trustees were authorised to make compromises, or any other arrangements which they might think beneficial to the trust.   On the 14th of *October,* 1822, at half past nine o'clock, A. M., the Bank of *P.,* the holders of the note in question, and other creditors of *B.* executed to him a full release, according to the provisions of the deed of assignment, of all debts and demands, and of all *actions* and *manner* of action, &c. which they then had, or *thereafter* might have, by reason of the debts to them respectively due, or owing, or growing due, from the said *B.*   This release was executed, among others, by the assignees of *A.*   On the same 14th of *October,* at ten o'clock A. M. the Bank of *P.* executed to *A.* a general release which had been procured for his creditors to sign, in compliance with the condition contained in his assignment, and had been executed about a week before by the assignees of *B.*   The note fell due on the 23rd of *October,* 1822, and was protested, of which notice was duly given to *B.,* the endorser.   On the 25th of *February,* 1823, the assignees of *A.* paid to the Bank of *P.* a dividend of ten per cent. on the said note.   On the 26th of *March,* in the same year, notice was given to the Bank of *P.* that the creditors of *B.* should send in their claims to his assignees, in order that they might declare a dividend.   On the 25th of *February,* 1824, another dividend of ten per cent. was paid by the assignees of *A.* to the Bank of *P.*   Two dividends were declared by the assignees of *B.,* one of thirty-three and a third per cent., and the other of ten per cent., on the debts of the assignor, and the Bank of *P.* having brought suit against the assignees of *B.,* to recover these two dividends, it was *held*:

1st, That *B.* was a competent witness for the plaintiffs to prove, that although *A.* was indebted to him on his private account in a small sum, and on their partnership accounts in a large sum, yet the note was not given or drawn on account of this indebtedness, but for the accommodation of the witness, with an understanding that he was to take it up when due, wherever he might get it discounted; and that he did not seek payment of the debt owing to him by *A.,* because he knew from *A.'s* circumstances that he was unable to make it.

2nd, That the release of the Bank of *P.* to *A.* the drawer of the note, did not discharge *B.* the endorser, and was therefore no bar to the plaintiffs' recovery.

3rd, That the Bank of *P.* were *embraced* by the terms of the assignment of *B.,* though the debt owing to them was not due at the time of its execution, and that they were entitled to recover the dividends declared by his assignees.

4th, That the rule for making a dividend, where more than one of the persons liable to the payment of a note or bill have failed, and made voluntary assignments of their property for the purpose of paying their respective debts and liabilities, is to take the amount actually due upon the note or bill, at the times respectively at which the first dividend is *declared* of each fund so assigned.

(Bank of Pennsylvania *v.* M'Calmont.)

THIS case was tried at Nisi Prius, before HUSTON, J., on the 31st of *January*, 1828, when a verdict was taken for the plaintiffs, for five hundred and eighty-five dollars, subject to the opinion of the court upon the whole of the evidence, as to the plaintiffs' right to recover, and the amount to which they were entitled.

There was a motion also on the part of the defendants, for a new trial, founded upon the admission by the judge of *John Strawbridge*, as a witness for the plaintiffs, who was objected to both on the ground of an alleged interest in the event of the suit, and of the nature of the evidence he was called to give.

The cause was argued by *Purdon* and *Chauncey* for the plaintiffs, and by *J. S. Smith* and *Binney* for the defendants; after which, the opinion of the court, in which the whole case is stated, was delivered by

KENNEDY, J.—This was an action brought against the defendants, who had become the assignees of the estate of *John Strawbridge*, in trust for the benefit of his creditors, upon certain conditions, to recover the amount of two dividends upon a note drawn by *George Strawbridge* for the accommodation of *John Strawbridge*, for thirteen hundred and fifty dollars, bearing date the 21st day of *August*, 1822, and payable sixty days after the date thereof to *Jonathan Smith*, or order, who endorsed it for the accommodation of *John Strawbridge*, who after endorsing it himself, got it discounted at the Bank of *Pennsylvania*, where he received the proceeds of it.

*John Strawbridge*, by his agreement with the drawer and payee of the note, was to pay it at maturity. Before, however, this time came around, *John Strawbridge* failed, and on the 13th of *September*, 1822, executed a deed of assignment to *George M'Calmont*, *John Turner*, Junior, and *John Hemphill*, the defendants in this action, of all his estate, both real and personal, in trust:—*First*, to pay all the expenses of the execution of the trust. *Second*, to pay all such custom-house bonds as were then due by him, or owing, or growing due, or for the payment of which he was in any way liable. *Third*, to pay and discharge all the debts that were by him *then due*, or *were owing* or *growing due*, to such of *his creditors* as should within the space of ninety days after the date of the assignment, if residing within the *United States*, and within six months if residing elsewhere, execute a general release of *all demands* and debts *whatsoever* against him; paying to his said creditors their debts in full, if the estate thereby assigned should be sufficient therefor; if not ,then in an equal and rateable proportion, according to the amount of their debts respectively. And in the last place, after satisfying and discharging the debts aforesaid, then to pay all his other creditors in equal proportion, according to the amount of their respective debts. He also furnished a list in writing to his assignees of his debts, which included the note in question.

On the 14th of *September*, 1822, *George Strawbridge*, the drawer of the note, having also failed, executed an assignment to *Henry*

*Simpson* and *John H. Linn*, of all and all manner of goods, chattels, book accounts, stocks, debts, effects, and all other estate and things of what nature and kind soever of him the said *George Strawbridge*, in trust, after paying the expenses incident to the execution of the trust, to pay and satisfy all such of his creditors as should within thirty days from that date execute legal releases of all their claims and demands upon him to the full amount thereof; paying them in full if sufficient, and if not, then rateably and proportionably. These trustees were authorized by the deed of trust, among other things, to make compromises, or any other arrangements they might think beneficial to the trust.

On the 14th of *October*, 1822, at half past nine o'clock in the morning, the plaintiffs in this action executed a release, which had been prepared by *John Strawbridge* for his creditors generally to sign, in compliance with the condition contained in the deed of assignment, and is in the following terms : " To all to whom these presents shall come, we who have set our hands and seals hereunto, *creditors* of *John Strawbridge* of the city of *Philadelphia*, merchant, send greeting. Whereas, the said *John Strawbridge* is *indebted* unto us respectively in certain several sums of money, for the payment of which he has assigned over all his estate, real and personal, by indenture, to certain trustees therein named, for the use of and to the intent that the same may be divided among his *creditors, according to the provisions of the said indenture.* Now know ye, that for the consideration aforesaid, each of us the said creditors, who have hereto set our hands and seals, for himself, his heirs, executors, administrators, successors and co-partners, doth by these presents, remise, release, and forever discharge the said *John Strawbridge*, his heirs, executors and administrators, of and from our said several debts and demands, and from *all actions* and *manner* of action, and actions and suits, which against the said *John Strawbridge* each of us now hath, or which each of us, and every of our heirs, executors or administrators respectively may *hereafter* have, by reason of the said several debts to us respectively due or owing, or growing due, from the said *John Strawbridge.* In witness," &c.

This release was also executed by *Henry Simpson* and *John H. Linn*, the assignees of *George Strawbridge*.

On the same 14th of *October*, at ten o'clock in the morning, the plaintiffs also executed a release to *George Strawbridge*, which had been procured by him for his creditors to sign, in compliance with the condition contained in his assignment, and had been executed about a week before by the defendants, as the assignees of *John Strawbridge*. It is in the following terms: " Know all men by these presents, that we whose names are hereunto subscribed, do hereby remise, release, and forever discharge, *George Strawbridge* of the city of *Philadelphia*, merchant, and his heirs, executors and administrators, of and from all, and all manner of actions, and causes of action, suits, debts, dues, accounts, bonds, covenants, contracts, agree-

ments, judgments, claims and demands whatsoever, at law or in equity, which against the said *George Strawbridge* we, or any of us, ever had, now have, or which our or any of our heirs, executors or administrators hereafter can, shall or may have, for or by reason of any cause, matter or thing whatsoever, from any period of time heretofore, to the date of our respective executions of these presents."

The note fell due on the 23rd of *October,* 1822, and was protested for non-payment, of which notice was duly given to *John Strawbridge* as the endorser.

On the 25th of *February,* 1823, the assignees of *George Strawbridge,* paid to the plaintiffs a dividend of ten per cent. amounting to one hundred and thirty-five dollars. On the 26th of *March,* in the same year, notice was given to the plaintiffs, that the creditors of *John Strawbridge* should send in their claims to the counting-house of the assignees, in order that they might declare a dividend. And again, on the 25th of *February,* 1824, another dividend of ten per cent. amounting to the like sum of one hundred and thirty-five dollars was paid by the assignees of *George Strawbridge,* to the plaintiffs.

Anterior to the bringing of this suit, two dividends were declared by the defendants, as the assignees of *John Strawbridge;* one of thirty-three and one-third per cent., which, on thirteen hundred and fifty dollars, would amount to four hundred and fifty dollars; and the other of ten per cent., which would amount to one hundred and thirty-five dollars, if calculated on the same sum. This action is brought to recover these two dividends.

On the trial of the cause, *John Strawbridge* was offered as a witness by the plaintiffs, to prove that the note of thirteen hundred and fifty dollars, was drawn by *George Strawbridge* for the use and accommodation of the witness. He was objected to by the defendants' counsel, but admitted by the judge who tried the cause. He testified, that although *George Strawbridge* was indebted to him on his private account, in the sum of thirty-three dollars, and on their partnership accounts in the sum of nine thousand dollars, yet the note was not given or drawn on account of this indebtedness, but for the accommodation of the witness, with an understanding that he was to take it up when due, wherever he might get it discounted: That he did not seek payment of the debt owing to him by *George,* because he knew from his circumstances that he was unable to make it.

A verdict of the jury was given in favour of the plaintiffs for five hundred and eighty-five dollars, with interest from the times of declaring the dividends respectively, subject however to the opinion of this court, whether, on the whole of the evidence, which went to establish the facts as already stated, the plaintiffs were entitled to recover anything in this action, and if they were, the court to say what amount.

The first question which presents itself is, was *John Strawbridge,* a competent witness; and in the next place, was his testimony admis-

(Bank of Pennsylvania *v.* M'Calmont.)

sible ?   I cannot perceive that he had such an interest in the event of this suit, as would render him incompetent.   It is true, it has been urged with great ingenuity, and I must confess too, with great force, that the plaintiffs are not embraced in the assignment made by *John Strawbridge :* That he was not their debtor at that time, nor yet at the time when they executed the release to him : That he did not become their debtor until the 23rd of *October*, 1822, when the note was protested for non-payment by the drawer, and notice thereof given to him, and that the release which was executed on the 14th of that same month, applied only to debts then existing, and could not therefore be a release of the claim of the plaintiffs, arising upon this note : That the witness is, therefore, still liable in his person and property to the plaintiffs for the payment of the whole amount of the note; but the recovery of the plaintiffs in this action will relieve him from this liability *pro tanto*, which shows that he is directly interested in maintaining the plaintiffs' recovery, and therefore an incompetent witness to sustain it.   I, however, after a good deal of inquiry as to the practice and understanding which have obtained in regard to assignments similar to those in the present case, which for many years past have been very common in some parts of this state, and especially in the city and county of *Philadelphia*, and likewise, after a very deliberate consideration of the whole matter, am of opinion that the plaintiffs and their claim upon the note against the witness are embraced in the assignment made by him, and that he is discharged by the release from all his liability on account of the note, or the endorsement of it, and that all objection to his competency as a witness, on the score of interest, is removed.   It has, however, been further objected, that he was incompetent, and his testimony ought not to have been received, because repugnant to a principle of mercantile policy, which will not permit a party to negotiable paper, to annul it, or to change its features or character, after he has in the ordinary course of business, given currency to it : That this was the effect of the testimony of the witness, who, after having passed the note by endorsement to the plaintiffs in this case, was called on to prove that it was drawn by the drawer for his, the witness's, accommodation, in order to raise money exclusively for his own use, and was discounted by the plaintiffs, from whom he received the proceeds thereof, which he applied to his own use; and was bound by his agreement with the drawer and payee of the note, to pay and take it up at maturity ;  thus making himself substantially, as it is contended, the drawer of the note, instead of the endorser, and making his liability, as that of the drawer also, different from the purport of the note itself, and the endorsement thereon.

The true meaning of this rule is, as I apprehend, that the party after having given currency to such paper, shall not be permitted to invalidate it, nor to impair it as a security, nor to change the liabilities of the parties respectively, contrary to the tenor and form of the note or paper and the endorsements thereon, to the prejudice of the

(Bank of Pennsylvania *v.* M'Calmont.)

holder thereof; because this would not only be in violation of good faith, but also destructive of that public confidence, which gives life and action to such paper, and is so indispensibly necessary to make it answer the purpose intended. But I see no good objection to having the true character of the original transaction exposed and made known, when it is required by the holder, in order to promote his interest and security, more than there would be to its being done between those who first framed it, which it is admitted on all hands may be done, and is certainly every day's practice. The testimony then, in this case, was not offered with a view to invalidate the note; and was offered by the plaintiffs who were the holders of the note. It was offered to show that the witness, who was the last endorser on the note, was the real debtor to whom the money was advanced by the plaintiffs, for his own use, upon the note, and that he was to pay it, without suffering the others, whose names were on it, to be called on for that purpose, as they derived no advantage from it. In short, to prove that the plaintiffs were the creditors of the witness at the time he made his assignment, and that he was their debtor, and consequently that they were embraced within the terms of the assignment. I think that it was not only competent for the plaintiffs to show all this, but that *John Strawbridge,* the last endorser on the note, was a competent witness to prove it, and that he was therefore properly received as a witness for that purpose.

The testimony of *John Strawbridge* having been properly received on the trial of the cause, establishes clearly, that the note was made for his accommodation and exclusive benefit, which disposes of one of the objections made by the defendants to the plaintiffs' recovery, that it was not an accommodation note.

But then it is further contended, that although it be an accommodation note, the release by the plaintiffs of *George Strawbridge,* the drawer of it, discharged *John Strawbridge,* the endorser, and that they therefore can have no claim as creditors of him to any portion of the funds assigned by him to the defendants for the payment of his debts.

To this it may be answered, that the plaintiffs did not execute the release to *George Strawbridge,* until after they had executed one in favour of *John Stawbridge,* in compliance with a condition required by him in his assignment, in order to entitle them to a certain grade of preference upon the fund assigned by him for the payment of their debt. By this arrangement, I consider that they are embraced by the terms of the assignment, which I shall endeavour to show more fully in answer to the next objection, became absolutely entitled to their proper proportion of this fund, which had been given up to them, or to the defendants for their use, with others, which is in effect the same, to be applied towards the payment of their debt, by the very man who, in point of fact, was the real debtor, and so considered and acknowledged by himself to be; and how or why the subsequent release of *George Strawbridge* could divest the plaintiffs

(Bank of Pennsylvania *v.* M'Calmont.)

of their right to this fund, I cannot imagine. Such release could work no possible injury to *John Strawbridge,* nor yet to any of his creditors who had a claim upon the fund in the hands of the defendants. I am therefore inclined to think, that this release which was given by the plaintiffs to *George Strawbridge,* is no bar to the plaintiffs' recovery in this action.

The next and last objection which has been raised against the plaintiffs' recovery in this case, is, that they are not embraced in the terms of the assignment made by *John Strawbridge,* which are, " to pay and discharge all the debts that were by him *then due,* or *were owing* or *growing due,* to such of *his creditors* as should," &c., and that the plaintiffs' claim does not fall within this description. In support of this, it has been argued that *John Strawbridge* was not absolutely bound by his endorsement to the plaintiffs for the payment of the amount of the note : That his liability was only conditional and contingent ; and that the nature and extent of his liability must be determined solely by his endorsement, and according to its legal effect : That by his endorsement he merely promised to pay the plaintiffs the amount of the note, provided they would present it at maturity to the drawer, demand payment of him, and upon his failing to pay, give immediate notice thereof to him, the endorser, but not otherwise : That until all this had taken place, it could not be said that *John Strawbridge,* the endorser, was indebted to the plaintiffs any thing upon his promise, and possibly never might become so ; for if the drawer paid the note at maturity upon its being presented to him for that purpose, neither lapse of time, nor any thing that the plaintiffs could do, would ever make the endorser debtor to the plaintiffs or make them his creditors ; but without indebtedness there could be no debt, and as no debt ever existed, it could not be said that any was either *due, owing* or *growing due ;* and consequently the plaintiffs did not come within the provisions of the assignment. This all appears to be very specious, and I must confess that I was at first so much taken with it as to incline to give into it ; but after revolving the whole case over and over again in my own mind, and upon more full deliberation and inquiry into the practice and usage which have obtained under such assignments, and especially in respect to those who have generally been considered and allowed to claim as creditors under them, I have come to the conclusion, that the plaintiffs are included in the terms of the assignment, and entitled to recover.

The note having been given without consideration, for the accommodation of *John Strawbridge,* no debt of any kind existed until he got the note discounted, but as soon as that was done a debt was created most clearly, and that too by his act, for his own exclusive benefit ; and under his agreement with the drawer and payee of the note, he then became absolutely bound to pay it at maturity, to the *bona fide* holders, whoever they might be. Although not absolutely bound to pay by virtue of his endorsement, yet, I conceive, that there can-

(Bank of Pennsylvania *v.* M'Calmont.)

not be a material difference if he were so upon any principle, and that he was, under his engagement with the drawer and payee, is indisputable.   It is clear, then, that a debt was created before the assignment was made, and was *growing due* at that time; that *John Strawbridge*, the assignor of the defendants, was in reality the debtor, and the plaintiffs were the creditors, and that he was under an obligation to pay them in any event.   Indeed, under a full view of the whole ground of the case, I cannot perceive that his liability had the least shade of contingency about it.   On the contrary, I think it was certain, absolute and unqualified.   Neither do I think it necessary that this absolute liability should have arisen from this endorsement, nor that it should have grown out of a promise made directly to the plaintiffs themselves.   It is sufficient that it existed at the time of the assignment, and was connected with the note in such a way as to follow and accompany it; and this, I think, was clearly the case. The plaintiffs held the note upon which they had advanced him the money, to be repaid according to the tenor of it.   To them payment was to be made, and to no others could it be made as long as they kept the note.   They, and they alone, had the power to release the assignor of the defendants from the payment of it; unless, indeed, the drawer or the payee had paid it for him, which was not to be expected, because contrary to their agreement with him when he obtained it from them.   The assignor of the defendants, sensible of his indebtedness, and absolute liability and engagement to pay this note, either at the time of, or shortly after making the assignment, made out a list of all his creditors, in which, among others, the plaintiffs' names were inserted, with the amount of the note thereto annexed, as the sum that was due to them, which he delivered to the defendants as well as the assignment.   The plaintiffs had no claim whatever against him beside the one created by discounting the note. They agreed to the assignment, and accepted of it by fulfilling the condition thereby required of them, in executing releases, which completely exonerated and discharged the assignor from all liability, either direct or indirect, absolute or contingent, for and on account of this note.   The release which was executed to himself, must be admitted to be sufficient to extinguish all liability which he was under to them directly; and the release which they gave to *George Strawbridge*, the drawer of the note, not only discharged him, but likewise the payee, so that neither of them could be made liable to pay any thing on account of the note or this debt, for which they could look to *John Strawbridge* for indemnity.   This was all that the assignor sought for or required, in order to give to the plaintiffs the right and the preference which they now claim; and he, having obtained his object to its fullest extent, within the time allowed for that purpose, they are justly entitled to a due proportion of the trust fund, in return for their concession to him.   The right too, which is set up here on the part of the plaintiffs, so far as I have been able to ascertain upon inquiry, is sanctioned by the universal practice in

allowing such claims, and in paying dividends upon them under similar assignments; and the distinction which has been made, and so ingeniously and ably contended for in this case, between absolute and contingent liabilty, has not been regarded or attended to in adjusting and settling claims and paying dividends out of funds assigned voluntarily by creditors for the payment of their debts. Neither am I altogether satisfied, that if it were attempted to be taken and acted on, the task would be found to be altogether free from difficulty in many cases that would arise. It was insisted on by the counsel for the defendants, that the promise of the indorser of a negotiable note, arising out of his indorsement by implication, was merely conditional, and his liability, and the debt as to him, purely contingent ; yet the drawer of bills of exchange, whose responsibility has sometimes been likened to that of the indorser of a negotiable note, where he is also the payee, and has passed it away in the course of business, was, in the case of *M'Carty* v. *Barrow*, 2 *Stran.* 949, ruled to have *contracted* the debts the very *instant when he drew the bills*, and that the non-acceptance or protest did not raise any debt, but was only notice to the party who held the bills, that the drawee would not pay the same ; and was as much as to say, " I will not pay the bills ; you may go back to the drawer, and he must pay you." And the court held the debts to be *debita in presenti, solvenda in futuro*, by the drawer. See Ld. Chief Justice WILMOT's report of this case, given in the opinion of the court delivered by him in *Chilton* v. *Whiffin*, 3 *Wils.* 17, which is more full, and no doubt more accurate, than Sir *John Strange's.* And see also the case *Ex parte . Douthat*, 4 *Barn. & Ald.* 67, where the same principle was settled and certified by the judges of the King's Bench, to the lord chancellor, in a case where the bill was accepted and duly paid by the drawee. I however deem it unnecessary to enter into a critical examination of this question, and the cases and authorities which might be thought to have a bearing upon it, as under the view which I have taken of the case itself, I can entertain no doubt, but a debt was created by *John Strawbridge*, the instant that he got the note discounted by the plaintiffs, which by his own agreement, he was absolutely bound to pay to the plaintiffs, or whoever should happen honestly to hold the note, at the time it became payable.

The only thing which remains now to be considered and settled, is the rule by which the amount of the plaintiffs' demand ought to be ascertained. Upon inquiry, I am induced to believe, that the rule which has been adopted generally in practice, where more than one of the persons liable to the payment of a note or bill have failed, and made voluntary assignments of their property for the purpose of paying their respective debts and liabilities, is to take the amount actually due upon the note or bill, at the times respectively at which the first dividend is *declared*, of each fund so assigned. For example, take the case before us : the first divid. nd was declared of . the property assigned by *George Strawbridge*, in *February* 1823, when the

thirteen hundred and fifty dollars, the original amount of the note, were due and altogether unpaid. This then was the sum upon which, according to the rule observed in practice, the dividend ought to have been declared. It was accordingly done so, and paid to the plaintiffs. Being ten per cent., it amounted to one hundred and thirty-five dollars, which reduced the plaintiffs' debt to twelve hundred and fifteen dollars, which is the sum that the defendants, when they subsequently, in *March*, 1823, and also since that, declared dividends, ought to have allowed dividends on to the plaintiffs.

This rule possibly has been derived from that which seems to have been adopted in *England* in cases of bankruptcy, which is, to take the amount of the debt actually due at the time of the creditor's first *proving* it against the fund. See *Ex parte Wildman*, 1 *Atk.* 109. S. C. 2 *Ves.* 113. *Ex parte Royd* and *Ex parte Bennet,* cited 2 *Ves.* 114, and *Ex parte Leers*, 6 *Ves.* 644. The only difference between the two cases seems to be, that in the case of bankruptcy the amount of the debt due at the time of the creditor's first *proving* it, is taken as the sum for which a dividend shall be allowed, but in the cases of voluntary assignments here, the amount due at the time of *declaring* the first dividend of each fund respectively, is taken as the sum upon which the dividend is to be allowed. I do not see any sufficient reason why this rule, which has already been adopted in practice here, should not also be adopted by the courts; for if it be as well suited as any other to subserve the ends of justice, and I think it is, it has at least the advantage of being known and familiar to that portion of the community who have the most to do with it, which is no slight recommendation for its adoption by the court. And indeed, it is highly probable, that from the long experience which has been had of its operation, without any attempt that we have heard of, to change it, it is quite as equitable, just and salutary, as any other that could be substituted.

We therefore direct the sum of each of the two dividends for which this suit was brought, to be ascertained by this rule, that interest be calculated on each from the time it was, or ought to have been declared, and that judgment be entered for the aggregate amount thereof in favour of the plaintiffs.

Judgment for the plaintiffs,