## VALIDITY OF A MODIFIED CITY CONTRACT.

Circuit Court of Lucas County.

JOHN H. LLOYD, A TAX-PAYER, ON BEHALF OF THE CITY OF TOLEDO, v. CITY OF TOLEDO ET AL.*

Decided, January 27, 1912.

*Municipal Corporations—Contracts for Public Improvements—May be Modified Without Action by Council—Discretion and Good Faith With Reference to Modifications—Failure of Record to Show Approval of Modified Contract—Sections 4211 and 4331.*

1. The statute requiring that action taken by the proper officials modifying an existing municipal contract shall be made a matter of record is directory only, and such action regularly taken is not nullified by failure through an oversight to make a record thereof.
2. Nor does failure by the city council to specifically authorize a modification by ordinance render such a modification invalid since a municipal improvement which has been duly authorized by council and the necessary appropriation made, is left by the municipal code to the proper board or officer to be carried to completion.
3. The record fails to disclose bad faith or any abuse of discretion in the modification by the officials in charge of the construction of a bridge over the Maumee river at Cherry street, Toledo.
4. Where an appropriation for a specific municipal improvement has been made and funds provided by a sale of bonds to pay for the entire cost of such improvement, and thereafter a new contract is entered into modifying some of the terms of the original contract, the failure of the city auditor to certify that the money was in the treasury to the credit of the fund from which it is to be drawn does not render the modified contract invalid and this is true for an additional reason when the modifying contract imposes no increased liability upon the city.

*Dismissed in the Supreme Court for want of preparation.

*C. A. Seiders* and *Frank H. Geer,* for plaintiff in error.

*Cornell Schreiber,* City Solicitor, and *A. G. Duer,* for city of Toledo.

*E. B. King,* for the C. H. Fath & Son Construction Company.

RICHARDS, J.; WILDMAN, J., and KINKADE, J., concur.

Appeal from the Court of Common Pleas of Lucas County.

The plaintiff brings this action as a tax-payer of the city of Toledo against the city, its officials, and the C. H. Fath & Son Construction Company, for the purpose of enjoining the construction of a bridge over the Maumee river at Cherry street, under the modifying contract of August 9, 1911, and to enforce its construction under the original contract of March 3, 1910, at the compensation claimed by the plaintiff to be provided therein, and for such further relief as he may be entitled to in equity.

The case has been submitted to us upon the evidence which was introduced in the court of common pleas and a large amount of additional evidence taken before a referee in this court, all of which we have carefully read. The questions at issue and the amount involved have been such as to command the most thorough consideration of counsel and of this court, and in our deliberation we have been greatly aided by the able arguments, both oral and typewritten, of counsel.

It appears from the evidence that the city provided the funds, amounting to $825,000, by the sale of bonds, and having taken the preliminary steps entered into the original contract with the C. H. Fath & Son Construction Company on March 3, 1910, for the construction of a reinforced concrete arch bridge to be built under the directions of engineers appointed by the city. Upon the execution of the original contract the work was commenced by the C. H. Fath & Son Construction Company and has been proceeded with to the present time. On August 9, 1911, a supplementary or modifying contract was entered into between said company and the city through the director of public service, the purpose of which was to modify the original method of construction in various respects.

The original plan contemplated that, by means of cofferdams which could be pumped out, the foundations of the piers should

be built in the dry, but in working on pier No. 6 water was encountered which appears to have seriously interfered with pursuing the work under that plan. The method adopted in the original plan was found by the city, on the advice of the consulting engineer, to be not feasible nor safe, especially for piers three and four, which adjoin the channel of the river where the head of water is strongest. By the original contract it was intended to use throughout most of the wells for laying the foundations, wooden lagging supported by iron rings, but the modified contract specifies steel cylinders in lieu thereof. The original contract, however, authorizes the use of shields, metal rings or steel cylinders under certain circumstances, when recommended by the engineers. The use of steel cylinders for the purpose intended is, of course, much more expensive than wooden lagging and iron rings, but the new contract provides for the removal from the work of the steel shields except the lower 24 feet 9 inches, and requires a credit to the city of four cents per pound, while the original contract failed to provide for any credit therefor. The modifying contract also provides for a layer of concrete called a blanket over the entire surface of the cofferdams six to ten feet thick, to be laid under water by means of a tremie pipe or other suitable method, and it further substitutes in certain places timber piles in place of concrete piles. In addition to the items already mentioned, the new contract requires the C. H. Fath & Son Construction Company to provide a compressed air plant and the city agrees to purchase the same at $6,000, if it should require its use, and to pay the net cost of its operation not exceeding $25 per day. The modifying contract extends the time for the completion of the bridge for a period of six months beyond the original contract.

The plaintiff contends that the modifying contract of August 9, 1911, is illegal and void for various reasons, and he asks to have it so adjudged by decree of this court.

The first ground of his contention to which we direct attention is based upon the claim that the city council did not authorize the contract and that it was not approved by the board of control, there being no record of such action by that board. Parol

evidence has been received, however, which establishes beyond all question that at a meeting of the board of control the modifying contract was duly approved by a unanimous vote. The secretary was not present at that meeting. The director of public service informed him soon after the meeting of the action taken by the board, for the purpose of having it recorded, but it was overlooked and no record ever made. In the light of this parol evidence, the charge contained in the petition that the director of public service, John R. Cowell, and the city solicitor, Cornell Schreiber, entered into and approved the contract without the authority of the board of control wholly fails. The statute requires a record of such action to be made, but we have no doubt that the statute is directory only, and the mere oversight of the clerk or secretary in failing to make a record of action duly taken by the board, can not nullify that action nor invalidate the contract based thereon. The general rule sustaining that doctrine is laid down in Volume 2, Dillon on Municipal Corporations, 5th Edition, Sections 557 and 558, being Sections 300 and 301 of the 4th Edition of that treatise. Such was the holding in *Drott* v. *Village of Riverside*, 2 C. D., 565, and in many other cases, and the rule appears to be founded on excellent reasons. Dillon's Treatise on Municipal Corporations has been a well recognized standard authority for a generation, and the author in the sections cited uses the following language:

"Where the records of a municipal corporation have been so carelessly and imperfectly kept as not to show the adoption of a resolution or other acts of the city council, and there is no written evidence in existence, parol testimony may be admitted, *e. g.*, to show that certain work was done by authority of the city, by proving the passage of a resolution of the council, the appointment of a committee to make the expenditure, their report after the work was done, and its adoption by the council."

That the contract was not specifically authorized by ordinance passed by the city council is not, in and of itself, sufficient to render it invalid. The municipal code contemplates that the city council shall, in inaugurating an improvement, give authority and make the necessary appropriation and shall take no further action, but that the business shall be conducted to com-

pletion by the board or officer having charge of the same. Section 4331 of the General Code vests in the director of public service power to make alterations and modifications upon approval of the board of control.

We have no doubt of the power of a municipal corporation to change or modify, with the consent of the other contracting party, contracts into which it has entered. Upon this proposition we cite *Weston* v. *Syracuse,* 158 N. Y., 274; *Meech* v. *Buffalo,* 29 N. Y., 198; *Doland* v. *Clark, Mayor,* 143 Cal., 176; *2 Dillon Municipal Corporations,* Section 820.

Such being the power and authority of the board of control and the director of public service, we are brought to the claim made by plaintiff that the modifying contract was entered into through fraud and bad faith and was an abuse of discretion on the part of that board and the director of public service. If the modifying contract is shown to be a result of fraud or bad faith, or if its execution was an abuse of the discretion vested in the city officials, then a tax-payer suing on behalf of the city, is, of course, entitled to the fullest relief from a court of equity. The charges made have required of the court a careful reading of the entire record covering some five hundred pages of testimony, and in addition thereto numerous exhibits.

It is not within the province of this court to determine whether the bridge should or could be built in accordance with the original plans, nor whether those plans ought to be modified to meet conditions encountered during the progress of the work, nor in what respects the plans should be modified, if at all. Those matters are all confided by the statutes of Ohio to the sound discretion of the city authorities. For a court to interfere and determine those questions would be to transcend its powers and usurp the functions of the board of control and director of public service.

The duty *is* cast upon this court of determining whether the board of control in authorizing the modifying contract, and the director of public service in entering into the same on behalf of the city, exceeded their powers under the law, and whether the said officials abused the discretion vested in them when they authorized and entered into the said contract.

We are unanimously of the opinion, after the most careful examination of the entire record, that the charges of fraud and bad faith and abuse of discretion are not sustained by the evidence, either as to the modifications provided or the extension of time for the completion of the bridge. We think the evidence shows that the city officers having this work in charge have acted in good faith, and, as was well stated by Judge Chittenden in the court of common pleas in his decision of the case, courts have ever hesitated to arrogate to themselves the right to be the censor or guardian of public officers who act in good faith.

The difficulties which had been encountered and the delays which had ensued under the original plans and the necessity of avoiding them in the future, as far as may be possible, consistent with approved methods, appear to have all been carefully considered by the director of public service and the board of control for weeks before the final execution of the contract of August 9, 1911. In some particulars there was a sharp conflict among the engineers in charge, notably with reference to the quality of concrete laid under water, and the wisdom of the change in the kind of piles to be used. These were engineering questions calling for the opinion of experts in the construction of foundations for bridges, and were properly referred to the consulting engineer, Ralph Modjeski. He gave the matter his personal attention and recommended the modified contract.

These questions so submitted and determined were in no sense judicial questions, but called for the exercise of sound business judgment and the highest grade of mechanical skill in engineering. This court is convinced, from the evidence, of Mr. Modjeski's thorough qualifications as an expert of national reputation in the construction of bridges, and he occupies the unique position in this case of being commended for his capacity and experience by every witness who has been called on for information whether testifying for the plaintiff or the defendants, and nothing in the records tends to impeach his integrity. Mr. Modjeski unhesitatingly gives his opinion that the modified plan is a wise one and should be followed.

Mr. Gessner, who is the severest critic of the new plan, is careful to state his position in his testimony taken before the referee in the following language:

"I do not attmpt in any of my answers to say that the bridge is unsafe under the modified construction, and I do not want to be so understood."

One of the allegations of fraud or bad faith contained in the petition consisted of the charge that K. F. Gill, an officer of the construction company, unduly used his influence as a friend of the mayor to bring about the execution of the supplementary contract. I mention this charge thus specifically for the purpose of directing attention to the fact that at no stage of the case has the plaintiff offered or attempted to offer any evidence to sustain the same, and I wish to express our disapproval of the practice of making reckless charges of bad faith in the pleadings not based on any evidence, for we assume that if the plaintiff had evidence to support the charge it would have been produced.

Before determining whether objections made by the plaintiff to the validity of the modifying contract are tenable, it is necessary that the court should construe the original contract and specifications with a view of ascertaining whether any of the so-called changes are within the terms and provisions of the first contract. It is contended by counsel for the C. H. Fath & Son Construction Company that all of the changes could have been properly made under the order and direction of the engineer pursuant to the terms of the original specifications and ontract, and without any necessity for a new one. Paragraph 28 of the original specifications, which is a part of the contract, provides as follows:

"28. Furnishing and placing metal lining for cylinder shafts. (See Section 13). This work will include all of the metal required for these shields, or metal linings, in case they are required. The engineers will decide whether or not these metal linings are necessary and will also furnish designs for same, or in case designs are submitted by the contractor, they shall be subject to the approval of the engineers."

Article III of the original contract contains the following provision:

"Art. III. It is understood and agreed by and between the parties hereto, that the. work included in this contract is to be done under the direction of the engineers, who will represent the owners on the work, and *that their decision as to the true construction and meaning of the drawings and specifications shall be final.*"

The specifications contemplated the use of *some* metal shields or linings, and we hold, in view of the wide discretion given to the engineers by the terms of the contract that the power is vested in them to decide whether they were necessary and if in the progress. of the work it became in the opinion of the engineers necessary that they should be used, then it might be properly done within the provisions of the original contract; and we see no reason why, if in their opinion it became necessary to do so, these steel cylinders might not be covered with a concrete blanket constructed under water, and all within the original contract, nor do we discover any reason why the metal, shields, linings or cylinders might not properly, in the same broad discretion confided to the engineers, be provided with a cutting edge and weighted with concrete in the manner which, as appears from the evidence, was subsequently adopted.

Courts will within reasonable limits give heed to the interpretations which the parties themselves have placed on their contracts, and it is in evidence that the parties to the first contract did interpret the same in such a manner as to evince their understanding that it authorized the use of steel cylinders for this purpose, for it appears from the evidence that the contractor, with the approval of the engineers, did on June 22, 1911, long before the execution of the modifying contract, purchase steel cylinders for use under the contract of March 3, 1910.

It is worthy of note that the price for metal shields under the original contract was seven cents per pound with no rebate, and that under the supplementary contract the city receives a rebate of four cents per pound for all steel not left permanently in the

wells.  Mr. Gessner, who is called by the plaintiff, testifies that if the metal cylinders properly come under item 28 of the original contract, then the bridge if built under the modifying contract will cost approximately $48,000 less than under the original contract.

It is manifest that, with the construction we place upon the contract of March 3, 1910, the provision for the rebate of four cents per pound inserted in the contract of August 9, 1911, will inure very largely to the benefit of the city.

Bearing this construction of the contracts in mind, we approach the next contention of plaintiff, that the modifying contract is invalid because the city auditor did not certify that the money was in the treasury to the credit of the fund from which it is to be drawn.  We do not understand that such a certificate is required where the fund is provided by the sale of bonds for a specific purpose (*Emmert* v. *Elyria,* 74 O. S., 185; *Akron* v. *Dobson,* 81 O. S., 66; *Kohler Brick Co.* v. *Toledo,* 10 C.C.[N.S.], 137).  Furthermore, as we construe these two contracts, the later one does not cast any increased obligation upon the city.

It is also insisted that the director of public service was without legal power to enter into the modifying contract, because it exceeds the sum of $500 and should have been let to the lowest bidder after advertising for bids.  We believe and hold that this objection is valid to the extent that the contract contemplates the purchase of a compressed air plant at $6,000, and provides a rental for use of the same, but beyond that the objection is without force.

As already indicated, the new contract aside from its provisions relative to the compressed air plant does not increase the liability of the city.  Even if it did so, it can not be that a contract providing for such alterations and modifications is required to be let to the lowest bidder after advertising.  Such a course, if it resulted in a contract with a different person than the one holding the main contract, would introduce inextricable confusion and would almost certainly result in vexatious delays and expensive litigation.  Such a course was held not to be necessary in *Hastings* v. *Columbus,* 42 O. S., 585 and 594; *Burke*

v. *Cleveland*, 6 N.P.(N.S.), 225 (affirmed without report, 75 O. S., 603).

The contract of August 9, 1911, provides that the steel shields from the rock upwards are to be of a permanent character, 24 feet 9 inches long, and above that point are to be so constructed that they can be removed and used again. It appears from the evidence that steel shields to the length of 36 feet 9 inches are left in some of the wells and have been paid for. The parties to the new contract having agreed on 24 feet 9 inches as the length to be left in the wells, no authority exists, so long as they continue to operate under the same, to pay for more than that and for the use at three cents per pound for such additional length as may be placed in the wells temporarily.

The record in this case contains evidence taken since the case was appealed to this court, tending to show that to construct the bridge under the modifying contract will, after making all rebates for steel removed, cost the city $900,000. The evidence further tends to show that if the bridge were constructed under the original contract and included the steel cylinders now being used, and allowed no rebate for steel removed, it would cost approximately $48,000 more.

It must be remembered that the bridge is being built on the unit plan, the specifications and contract so providing, and that therefore the precise total cost is not known, because it is not known just how many pounds of steel, cement, etc., will be required. These were, however, approximated in the estimates claimed to have been made by the engineers for the city. The original estimates, said in evidence to have been made by them under the first contract, were $813,000. The fund provided by the sale of bonds amounted to $825,000, being the total sum appropriated for such work and is the limit beyond which the board of control and the director of public service may not go in the performance of these contracts. It was said by the Supreme Court in *Village of Carthage* v. *Dickmeier*, 79 O. S., 323, 345, in a case where the village clerk's certificate was required to be filed because numerous contracts were made for separate improvements to be paid from a gross fund, that it was not within the power of the council to increase the liability of a municipal

corporation beyond the amount for which the certificate had been filed. The court states that to so hold would strike down the statute. In like manner in the case at bar where no certificate · is required, because a single fund raised by a bond issue is appropriated to a single public work and the limitation is the fund so appropriated, to go beyond that fund would be to disregard the general policy of the state as embodied in the statutes providing the restrictions under which municipal improvements may be made. It is manifest that the amount certified to be in the treasury to the credit of the fund can never exceed the total amount appropriated for the work, and that the requirement to keep within the amount so certified contemp'ates that the amount appropriated shall not be exceeded. See General Code, Section 4211; *Akron* v. *Dobson*, 81 O. S., 66, 78.

The contracts under review provide for a work of great magnitude for which the city has already appropriated $825,000 and upon which more than $200,000 has already been expended. The construction under the supplementary contract has proceeded for more than five months along the lines and in pursuance of the modifying plans adopted by the city on the advice of the consulting engineer. To stop the work by order of court or to require a return to the original method at this time wou'd produce great confusion and would probably be calamitous in its consequences. To justify a court of equity in entering such a decree, it should be clearly and unequivocally required by the circumstances of the case.

It follows from what has been said that the injunction must be denied except as to the compressed air plant, and for the steel left in the wells in excess of 24 feet 9 inches, and that the total expenditures under the two contracts shall not exceed the amount appropriated therefor.

It must be understood that nothing contained in the foregoing decision is intended to express any opinion as to the power of the city council with reference to further appropriations for the completion of the bridge, if occasion therefor should arise.