UNITED STATES of America,
Plaintiff–Appellee,

v.

David TAKETA and Thomas O'Brien,
Defendants–Appellants.

Nos. 88–1022, 88–1024.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 12, 1988.

Decided Jan. 8, 1991.

Richard R. Shreves, Oscar B. Goodman, and David Z. Chesnoff, Goodman, Stein, Chesnoff & Quintana, Las Vegas, Nev., for defendants-appellants.

Howard J. Zlotnick and Camille W. Chamberlain, Asst. U.S. Attys., Las Vegas, Nev., for plaintiff-appellee.

Before: FLETCHER, BEEZER and O'SCANNLAIN, Circuit Judges.

BEEZER, Circuit Judge:

David Taketa, a Drug Enforcement Administration ("DEA") agent, and Thomas O'Brien, an officer of the Nevada Bureau of Investigations ("NBI"), appeal their convictions for illegal wiretapping. The appellants contend that their convictions were obtained through the use of evidence seized in violation of the fourth amendment, that videotape evidence was improperly admitted, and that the district court improperly commented on the evidence. We hold that there was no fourth amendment violation by the warrantless search of O'Brien's office. However, we hold that the admission into evidence of a videotape of O'Brien and Taketa violated the fourth amendment, and consequently reverse their convictions.

---

**I**

The facts of this case resemble a bad spy novel. David Taketa was the Special Agent in charge of the DEA office at McCarran International Airport in Las Vegas, Nevada. He shared the office with Thomas O'Brien, an NBI officer assigned to the DEA airport office for the purpose of joint federal-state investigations, but not working directly for the DEA. Another DEA agent, Leroy Kenneth Hartung, also worked at the airport office.

On April 3, 1986, DEA Agent Beth Walther Latheberry reported to Joseph Catale, the Resident Agent in Charge of DEA operations in Las Vegas, that Taketa had shown her how to modify a pen register to intercept telephone conversations illegally.[1] Catale initiated an investigation. DEA Special Agent Peter MacVean from the Los Angeles technical operations group was sent to assist.

The airport office consisted of a large office with two smaller offices attached. Hartung used the larger general office, while Taketa and O'Brien each used one of the smaller private offices. Although the airport office was under Catale's authority, its operations tended to be independent from those of the downtown office.

On the night of April 24, 1986, Catale and MacVean entered the airport office by means of a master key Catale had obtained from Hartung. The doors to the inner offices were open. Catale and MacVean examined the airport office to determine the feasibility of installing video surveillance equipment the next time the office was authorized to operate a pen register.

In May 1986, the airport office received authority to use a pen register in an investigation of one Eugenio Rodriguez. On the night of May 15, 1986, Catale, MacVean, and another agent reentered the airport office. They did not see the pen register in

---

1. A pen register is a device that records the numbers dialed from a monitored telephone. Its use is not constrained by the fourth amendment. *Smith v. Maryland,* 442 U.S. 735, 745–46, 99 S.Ct. 2577, 2582–83, 61 L.Ed.2d 220 (1979). However, during the period in question it was DEA policy to obtain judicial authorization prior to using a pen register. *See United States v.*

*New York Telephone Co.,* 434 U.S. 159, 168–69, 98 S.Ct. 364, 370–71, 54 L.Ed.2d 376 (1977). Pen register authorization does not allow the tapping of the targeted telephone to intercept the contents of calls, because wiretaps are limited by the special requirements of Title III, 18 U.S.C. §§ 2510–20 (Supp. IV 1986).

the large general office or in Taketa's office. The agents determined that the pen register was operating in O'Brien's office because that was where the phone lines terminated. O'Brien's door was locked, and the agents did not have a key. They forced the lock with a plastic card and entered O'Brien's office. Inside, they found a pen register in operation. A cable ran from the pen register to a briefcase. The agents opened the briefcase. Inside it they found a Bell & Howell "intelligence kit" used for covert audio surveillance. The intelligence kit was recording telephone calls picked up by the pen register; in fact, a call was recorded while the agents were in O'Brien's office.

The agents removed and copied the audio tape found in the intelligence kit and then inserted a duplicate tape in place of the original. They took photographs of the scene, and installed a hidden video camera in the ceiling of the office. The video camera photographed only the area of the office in which the pen register and intelligence kit were located; it did not have audio capability. On May 16, MacVean obtained a search warrant for the airport office based on what he had learned during his covert entry. Between May 16 and May 19, MacVean entered the airport office twice more at night to replace tapes in the surveillance camera. The doors to the inner offices were open on both occasions. On May 19, 1986, DEA agents executed the search warrant, seizing numerous personal and business items from Taketa and O'Brien.

The appellants were indicted on several counts of illegal interception of wire communications, conspiracy to intercept such communications, and use of intercepted communications, all in violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20.[2] They moved to suppress all the aforementioned evidence under the exclusionary rule. The district court denied the motion. The court, relying on *O'Connor v. Ortega*, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714

(1987), found that the appellants did not have a reasonable expectation of privacy in O'Brien's office because of DEA policy and the shared nature of the offices; that the surveillance was "reasonably related" to the legitimate goal of uncovering "work-related misconduct"; that probable cause was not required under *O'Connor*, and that the agents' actions were not unreasonably intrusive.

■ The appellants were convicted after a jury trial of four of the six counts, and given suspended sentences of five years imprisonment, with 300 hours of community service. They timely filed a consolidated appeal. We have jurisdiction. 28 U.S.C. § 1291 (1988); Fed.R.App.P. 4(b). As a mixed question of law and fact, we review de novo the ultimate lawfulness of a search. *United States v. Feldman*, 788 F.2d 544, 550 (9th Cir.1986), *cert. denied*, 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987).

## II

Counsel for the appellants argues that a determination of the search's constitutionality will apply equally to Taketa and O'Brien. We disagree. The incriminating evidence came only from O'Brien's office. We must first consider, therefore, whether Taketa has standing to challenge the search of O'Brien's office.

■ The term "standing" is often used to describe an inquiry into who may assert a particular fourth amendment claim. *See, e.g., Rakas v. Illinois*, 439 U.S. 128, 139–40, 99 S.Ct. 421, 428–29, 58 L.Ed.2d 387 (1978). Fourth amendment standing is quite different, however, from "case or controversy" determinations of article III standing. *Id.* Rather, it is a matter of substantive fourth amendment law; to say that a party lacks fourth amendment standing is to say that *his* reasonable expectation of privacy has not been infringed. *See*

2. Hartung was named as a coconspirator, but not indicted. He testified against the appellants.

**670**

*id.* It is with this understanding that we use "standing" as a shorthand term.

In *Rakas,* the Supreme Court explicitly rejected concepts of "vicarious" or "target" standing to assert fourth amendment rights. *Id.* at 133–38, 99 S.Ct. at 425–28. Reiterating that fourth amendment rights are *personal* rights, the Court stated that "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Id.* at 134, 99 S.Ct. at 425.

■ Before reaching the merits of the question of Taketa's standing, we must determine whether the government has waived this issue. The government has not specifically claimed on appeal that Taketa has no personal fourth amendment standing.[3] Rather, it has generally asserted that the appellants lacked reasonable expectations of privacy in their offices. In *Steagald v. United States,* 451 U.S. 204, 208–11, 101 S.Ct. 1642, 1646–47, 68 L.Ed.2d 38 (1981), the Court declined to consider the argument, not raised before either the district or the appellate courts, that the petitioner lacked an expectation of privacy in his house. The Court held that the government's failure to object to contrary findings waived the issue. *Id.*

Similarly, in *United States v. Sherwin,* we did not consider a challenge to fourth amendment standing not raised in the district court or as an original ground for appeal. 539 F.2d 1, 5 n. 4 (9th Cir.1976) (en banc). Moreover, Judge Kennedy cited his *Sherwin* precedent a decade later in a case that correctly distinguished fourth amendment from Article III standing in light of *Rakas,* and declined to consider a fourth amendment standing argument that apparently would have been decided in favor of the government if timely raised. *United States v. Spilotro,* 800 F.2d 959, 962–63 (9th Cir.1986).

We conclude that both *Steagald* and the *Sherwin* line of case law can be distinguished from the present appeal. In *Steagald,* the government repeatedly had acquiesced in the district and appellate courts incorrect findings of fact regarding Steagald's status. 451 U.S. at 210, 101 S.Ct. at 1646. Here, although the government did not press the issue in the district court, it neither assented to contrary findings of fact nor abandoned the issue. The reliance issue raised by *Steagald* does not concern us here.

*Sherwin* and *Spilotro* involved government appeals of suppression motions that had been granted. It was proper that in that circumstance the appellate courts declined to consider government arguments untimely raised. In this case, by contrast, we consider a defendant's appeal of a suppression motion that was denied, when the question was raised in the district court. The burden of demonstrating that the evidence should have been suppressed is upon the appellants. *See United States v. Nadler,* 698 F.2d 995, 998 (9th Cir.1983). Taketa must demonstrate that he had a reasonable expectation of privacy in O'Brien's office even if the government has not argued on appeal that his interest differs from O'Brien's.

Our holding in *United States v. Robertson,* 833 F.2d 777, 779 (9th Cir.1987), is controlling. In *Robertson,* we invoked standing as a "fundamental obstacle" to a challenge to a warrant issued for a codefendant's arrest, stating that a "defendant must show [fourth amendment] standing even if the government has not pressed the issue in the district court." *Id. Robertson* relied on *Nadler,* which held in no uncertain terms that the government's failure to raise the issue during a suppression hearing was of "no consequence." *Nadler,* 698 F.2d at 998. The government, therefore, has not waived the issue of Taketa's standing.

■ A valid fourth amendment claim requires a subjective expectation of privacy that is objectively reasonable. *Smith v. Maryland,* 442 U.S. at 740, 99 S.Ct. at

---

**3.** The question was briefly raised during oral argument in the district court on the motion to suppress, but was not addressed in the court's opinion.

2580; *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). Even if we assume that Taketa had a subjective expectation of privacy in O'Brien's office, we cannot find such an expectation to be objectively reasonable. In the employment context, we have found a reasonable expectation of privacy to exist in an area "given over to [an employee's] exclusive use." *Schowengerdt v. General Dynamics Corp.,* 823 F.2d 1328, 1335 (9th Cir.1987). O'Brien's office was given over to O'Brien's exclusive use and contained his personal desk and files; the fact that Taketa had access to it, and used it for his own illegal activities in conspiracy with O'Brien, does not lead us to find an objectively reasonable expectation of privacy.

 The final argument supporting Taketa's standing to challenge the search of O'Brien's office is based on a line of Ninth Circuit case law that has carved out what might be termed a "coconspirator exception" to the general *Rakas* rule against contesting the violation of another person's fourth amendment rights. We allow a defendant to contest a search of a third party's property if he had a reasonable expectation of privacy in the property based on a formal arrangement. *See, e.g., United States v. Johns,* 851 F.2d 1131, 1135–36 (9th Cir.1988) (per curiam) (formalized arrangement indicating joint control and supervision supports a legitimate expectation of privacy); *United States v. Pollock,* 726 F.2d 1456, 1465 (9th Cir.1984) (defendant exercised "joint control" over drug laboratory in his friend's house); *United States v. Johns,* 707 F.2d 1093, 1099–1100 (9th Cir.1983) (defendant could contest seizure of drugs from another's vehicle because of their formal arrangement to transport contraband), *rev'd on other grounds,* 469 U.S. 478, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985); *United States v. Perez,* 689 F.2d 1336, 1337–38 (9th Cir.1982) (per curiam) (defendants driving accompanying vehicle could contest seizure of drugs from truck driven by coconspirator); *but see United States v.*

*Kovac,* 795 F.2d 1509, 1510–11 (9th Cir. 1986) (insufficient formal arrangements of joint control), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 951, 93 L.Ed.2d 1000 (1987).

Our case law, however, is far from clear on the question of what "formal arrangements for joint control" actually means. The phrase could require, at one end of the spectrum, a written contract to engage in illegal activities in a particular place, or, at the other extreme, it could be a general relaxation of the rules of fourth amendment standing for all persons accused of participating in a cooperative illegal venture. Obviously, the correct distinguishing point lies somewhere between these two extremes. We engage in a fact-specific analysis that includes consideration of the degree of cooperation and the respective possessory interests asserted.

Hartung's testimony [4] indicated that the level of cooperation between Taketa, O'Brien, and Hartung in the illegal ventures was high, and that the agreed-upon venue for them was O'Brien's office. However, Taketa had no ownership interest in the items seized, which were government property. In virtually every case applying the coconspirator exception, the party granted standing to contest the search of another's property himself had an ownership interest in seized or searched property. *See, e.g., Johns,* 851 F.2d at 1136; *United States v. Quinn,* 751 F.2d 980, 981 (9th Cir.1984) (per curiam), *cert. dismissed,* 475 U.S. 791, 106 S.Ct. 1623, 89 L.Ed.2d 803 (1986); *Johns,* 707 F.2d at 1099–1100; *Perez,* 689 F.2d at 1337–38; *United States v. Robertson,* 606 F.2d 853, 858 n. 2 (9th Cir.1979).

In *United States v. Broadhurst,* actual ownership was less clear, but there was extensive evidence of formalized business arrangements to grow marijuana on a rural site. 805 F.2d 849, 851–52 (9th Cir.1986). In *Pollock,* possessory interests were likewise unclear, but we emphasized the fact that the coconspirator was present at the

---

**4.** As Taketa and O'Brien did not take the stand, Hartung's testimony provides the best guide to

the conspiracy.

time of the search. 726 F.2d at 1465 (citing *Rakas*, 439 U.S. at 142–43, 99 S.Ct. at 429–30, for the proposition that legitimate presence on the premises is relevant—but not central—to the inquiry into the legitimate expectation of privacy); *but see Broadhurst*, 805 F.2d at 852 (limiting importance of presence on premises in fourth amendment inquiry).

The instant case is a close one. We hold, however, that Taketa demonstrates an insufficient interest in the contents of O'Brien's office to establish fourth amendment standing under the coconspirator exception. *See Kovac*, 795 F.2d at 1510–11; *United States v. Mendia*, 731 F.2d 1412, 1414 (9th Cir.), *cert. denied*, 469 U.S. 1035, 105 S.Ct. 509, 83 L.Ed.2d 399 (1984); *United States v. One 1977 Mercedes Benz*, 708 F.2d 444, 448–49 (9th Cir.1983), *cert. denied*, 464 U.S. 1071, 104 S.Ct. 981, 79 L.Ed.2d 217 (1984); *United States v. Portillo*, 633 F.2d 1313, 1316–17 (9th Cir.1980), *cert. denied*, 450 U.S. 1043, 101 S.Ct. 1763, 1764, 68 L.Ed.2d 241 (1981). Taketa asserts no ownership interest in the items seized from O'Brien's office. He was not present when the search was conducted. The elements of the conspiracy, when assessed for their possible character as "formal arrangements for joint control," are no stronger than those typically present in a criminal conspiracy involving a specific place for unlawful activity.

To hold that these conspirators all have a legitimate interest in privacy in O'Brien's office would establish the Ninth Circuit's "coconspirator exception" as a true coconspirator exception of general applicability to any person accused of criminal conspiracy. Such a blanket exception to *Rakas* would contravene holdings of the Supreme Court and this circuit. *See Alderman v. United States*, 394 U.S. 165, 172, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1969) ("Coconspirators and codefendants have been accorded no special [fourth amendment] standing"); *United States v. Turner*, 528 F.2d 143, 164 (9th Cir.), *cert. denied*, 423 U.S. 996, 96 S.Ct. 426, 46 L.Ed.2d 371 (1975), 429 U.S. 837, 97 S.Ct. 105, 50 L.Ed.2d 103 (1976). We deny fourth amendment standing to Taketa to contest the warrantless entry of O'Brien's office, but consider his other challenges to his conviction *infra*.

## III

■ We next inquire whether O'Brien had a reasonable expectation of privacy in his office. If not, there was no fourth amendment violation regardless of the nature of the search. *O'Connor*, and our application of *O'Connor*, have found privacy interests in employees' desks and files. *O'Connor*, 480 U.S. at 719, 107 S.Ct. at 1498; *Schowengerdt*, 823 F.2d at 1334. Here, however, O'Brien asks us to find a reasonable privacy interest in the whole of a government office containing costly government equipment.

■ The privacy analysis does not turn on property rights. *Schowengerdt*, 823 F.2d at 1333. A person may have a privacy interest in his office, not just in his personal effects, if he meets the *Katz* test of a subjective expectation of privacy that is objectively reasonable. *See id.; Katz*, 389 U.S. at 361, 88 S.Ct. at 516. The first part of the test has special relevance in the employment context, as a valid regulation may defeat an otherwise reasonable expectation of workplace privacy. *E.g., United States v. Bunkers*, 521 F.2d 1217, 1219–20 (9th Cir.) (search of postal worker's locker authorized by regulation), *cert. denied*, 423 U.S. 989, 96 S.Ct. 400, 46 L.Ed.2d 307 (1975). We have held, however, that a police chief had a reasonable expectation of privacy in conversations he held in his bugged office. *McIntyre*, 582 F.2d at 1223–24. No established regulatory scheme or specific office practice defeated that expectation. *Id.* at 1224.

The regulations and office practices offered by the government to defeat O'Brien's privacy interest fail to do so. The government relies on a DEA regulation requiring employees to maintain clean desks and, based on that regulation, argues that O'Brien's office was subject to inspection at any time. We do not accept this argument. First, O'Brien was not a DEA employee subject to the regulation. Second, such a regulation, unenforced by a

practice of inspections, cannot reasonably serve as an after-the-fact rationalization of the DEA's entry.

The government also argues that the DEA's policy requiring the DEA's downtown Las Vegas office to keep a key to the airport office defeated privacy expectations at the airport. The DEA did not have a key to O'Brien's office, however, and had to force the lock. Furthermore, the appellants correctly point out that allowing the existence of a master key to overcome the expectation of privacy would defeat the legitimate privacy interest of any hotel, office, or apartment occupant.

The government further contends that the access of other airport DEA employees to O'Brien's office defeated his expectation of privacy. This contention is misplaced. Privacy does not require solitude. As *O'Connor* recognized, even "private" business offices are often subject to the legitimate visits of coworkers, supervisors, and the public, without defeating the expectation of privacy unless the office is "so open to fellow employees or the public that no expectation of privacy is reasonable." *O'Connor*, 480 U.S. at 717–18, 107 S.Ct. at 1498. O'Brien's office was not open to the public, and was not subjected to regular visits of inspection by DEA personnel. The only people to have regular access to it were the three agents stationed at the airport. The access of others does not defeat O'Brien's expectation of privacy in his office.

Nor was the expectation of privacy defeated by O'Brien's failure to shut and lock his door at all times (although, notably, he did lock the door on the night the incriminating evidence was first discovered). We specifically rejected this argument in *McIntyre*, 582 F.2d at 1224.

Under the second part of *Katz*, O'Brien's expectation of privacy in his office must have been an objectively reasonable one that society is prepared to acknowledge. *Katz*, 389 U.S. at 361, 88 S.Ct. at 516. We find a privacy interest in an office reserved for one's exclusive use at a place of employment to be reasonable, especially when asserted against a forcible entry after

work hours. *See Schowengerdt*, 823 F.2d at 1335 (employee had reasonable expectation of privacy in an area "given over to his exclusive use").

The government offers several further justifications for the DEA intrusion. It argues that the search targeted government property, the pen register, that was being misused. The DEA undoubtedly had a valid interest in its property. *See, e.g., O'Connor*, 480 U.S. at 723, 107 S.Ct. at 1500 ("concept of probable cause has little meaning for a routine inventory conducted by public employers for the purpose of securing state property"). The DEA, however, had no policy of regular inspections of its employees' private offices for inventory purposes.

The government also contends that Agent Catale, as the head of the DEA in Las Vegas, was able to consent to the search on behalf of the appellants. This argument is meritless; allowing such employer "consent" would destroy the expectations of privacy in the workplace we have recognized as valid. *See, e.g., Schowengerdt*, 823 F.2d at 1335.

We find that O'Brien had a reasonable expectation of privacy in his office. We move to the question whether the warrantless search of O'Brien's office violated his reasonable expectation of privacy.

## IV

O'Brien claims that the warrantless searches of his office violated the fourth amendment. We disagree. Although the search of O'Brien's office is subject to fourth amendment restraints, the Supreme Court has stated that the "operational realities of the workplace ... may make *some* employees' expectations of privacy unreasonable when an intrusion is by a supervisor rather than a law enforcement official." *O'Connor v. Ortega*, 480 U.S. at 717, 107 S.Ct. at 1497. The *O'Connor* Court held that "public employer intrusions on the constitutionally protected privacy interests of government employees for noninvestigatory, work-related purposes, as well as for investigations of work-related

misconduct, should be judged by the standard of reasonableness under all the circumstances." *Id.* at 725–26, 107 S.Ct. at 1502.

The initial search of O'Brien's office was an internal investigation directed at uncovering work-related employee misconduct. The DEA was acting in its capacity as an employer by performing an internal investigation into the possibility that Taketa was misusing the pen register. The investigation was initiated by a fellow DEA Agent's report that Taketa admitted rigging pen registers to record the content of telephone calls. This general allegation, while falling short of probable cause, provided sufficient basis for the commencement of an internal investigation.

The initial search of O'Brien's office, therefore, was not subject to the fourth amendment warrant requirement but was governed by *O'Connor's* lesser burden of reasonableness. Although O'Brien was not a DEA employee, *O'Connor* still applies to the search of his office. His office was part of the workplace that was within the control of the DEA. He worked as part of an "informal task force" arrangement between the DEA and the NBI. Moreover, O'Brien's office was the point at which the phone lines for the offices terminated and thus was the only location for operating a pen register. O'Brien's office would inevitably be a part of a DEA internal investigation into the use of pen registers at the airport office. Accordingly, it was reasonable for the DEA to search O'Brien's office.

Because we have determined that the search of O'Brien's office was reasonable under *O'Connor,* there is no fourth amendment violation of which O'Brien can complain. This conclusion applies whether or not O'Brien was the target of the investigation.

In *Zurcher v. Stanford Daily,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978), the Supreme Court held that "[t]he critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Id.* at 556, 98 S.Ct. at 1977. Applying the reasoning in *Zurcher* to an *O'Connor* search, the correct inquiry is whether there was reasonable cause to believe that evidence of employee misconduct was located on the property that was searched. *Cf., United States v. Webster,* 750 F.2d 307, 318 (5th Cir.1984) (search warrant may issue if there is probable cause to believe that evidence of criminal activity is located at place to be searched), *cert. denied,* 471 U.S. 1106, 105 S.Ct. 2340, 2341, 85 L.Ed.2d 855, 856 (1985); *United States v. Tehfe,* 722 F.2d 1114, 1118 (3d Cir.1983) ("Property owned by a person absolutely innocent of any wrongdoing may nevertheless be searched under a valid warrant."), *cert. denied,* 466 U.S. 904, 104 S.Ct. 1679, 80 L.Ed.2d 154 (1984); *United States v. Melvin,* 596 F.2d 492, 496 (1st Cir.) (*Zurcher's* rule applies "to a person who the police do indeed suspect but do not have probable cause to arrest; such a person's property may be searched upon probable cause to believe that ... evidence of the crime [is] present, even though the products of the search may implicate him."), *cert. denied,* 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979).

In the instant case, the DEA reasonably suspected that if a pen register was being misused, the evidence of the employee misconduct would be located in O'Brien's office. O'Brien, therefore, cannot assert that his fourth amendment rights were violated.

We hold that O'Brien's reasonable expectation of privacy was not violated by the warrantless search of his office. Considering all the circumstances in light of the standard set forth in *O'Connor,* it was not unreasonable for the DEA agents to enter O'Brien's office as a part of the internal investigation that was directed at uncovering evidence of a DEA employee's misuse of a pen register. The government was entitled to use the evidence collected on the night of May 15 against both Taketa and O'Brien.

V

The next question is whether the videotape evidence should have been suppressed,

independent of the alleged illegal search. The appellants argue that even if the initial search was otherwise valid, a warrant was required for video surveillance. We will reach this argument for O'Brien first and then consider whether Taketa may benefit from it.

■ Title III, 18 U.S.C. §§ 2510–20, prohibits unauthorized aural interception of communications. Since the videotaping did not intercept the contents of any communications, it did not violate Title III. Three circuits, while recognizing that videotaping does not fall within the letter of Title III, have required that applicants for warrants to videotape suspected criminal activities meet the higher constitutional standards required under Title III for wiretap warrants. *United States v. Cuevas–Sanchez*, 821 F.2d 248, 251–52 (5th Cir.1987) (quoting George Orwell's *1984*); *United States v. Biasucci*, 786 F.2d 504, 510 (2d Cir.), *cert. denied*, 479 U.S. 827, 107 S.Ct. 104, 107, 93 L.Ed.2d 54, 56 (1986); *United States v. Torres*, 751 F.2d 875, 884–85 (7th Cir.1984), *cert. denied*, 470 U.S. 1087, 105 S.Ct. 1853, 85 L.Ed.2d 150 (1985). We have not had occasion to decide this question.

Nor must we decide it today. If the warrantless filming violated the reasonable privacy interests of O'Brien and Taketa, the introduction of the tape into evidence constituted reversible error. The question before us, then, is not what standards apply to warrants for video surveillance, but whether a warrant was required at all under the fourth amendment. We begin this inquiry mindful of our earlier determination that O'Brien had a reasonable expectation of privacy in his office.

■ We find that the video surveillance was not an investigation of work-related employee misconduct that could benefit from the reasonableness standard of *O'Connor*. It was, rather, a search for evidence of criminal conduct. At trial, MacVean, the DEA agent brought in to assist in the investigation, conceded this point when he testified that the investigation had changed from an internal affairs investigation into a criminal investigation once confirmation of an illegal wiretap was

made. The fact that MacVean obtained a search warrant on May 16, the day after he confirmed the illegal wiretap and installed the video camera, further substantiates this change in the character of the investigation.

On the night of May 15, when MacVean switched roles from public employer to criminal investigator, the investigation changed and the standard of reasonableness imposed on the search changed with it. No longer could the DEA rely on *O'Connor*. The rationale for the lesser burden *O'Connor* places on public employers is not applicable for federal agents engaged in a criminal investigation. As the *O'Connor* Court noted in declining to hold public employers to the probable cause standard,

> while law enforcement officials are expected to 'school themselves in the niceties of probable cause,' no such expectation is generally applicable to public employers, at least when the search is not used to gather evidence of a criminal offense.

480 U.S. at 724, 107 S.Ct. at 1501. The DEA cannot cloak itself in its public employer robes in order to avoid the probable cause requirement when it is acquiring evidence for a criminal prosecution. While the burden of showing probable cause and obtaining a warrant may be "intolerable" for public employers, *id.*, it is *de rigueur* for law enforcement officials.

The warrantless video taping, therefore, violated O'Brien's reasonable privacy interests, and its subsequent introduction into evidence constituted reversible error. We reverse O'Brien's conviction.

■ The next question is whether Taketa has standing to challenge the fourth amendment violation that occurred in O'Brien's office. We first recognize that our holding that Taketa does not have standing to contest the nighttime search of O'Brien's office does not necessarily extend to the videotaping. The videotaping was a continuous search of anyone who entered the camera's field of vision, *see, e.g., Cuevas–Sanchez*, 821 F.2d at 251 (video sur-

veillance is a fourth amendment search), and thus it was far more intrusive than the nighttime searches. *See, e.g., Torres,* 751 F.2d at 882–83 (declining to hold television surveillance *per se* unconstitutional, but recognizing its clear potential for abuse). It appears that Taketa played at least a supporting role in the government's feature film made on location in O'Brien's office.

An illegal wiretap may be challenged in court by any person "aggrieved" by the surveillance. 18 U.S.C. § 2518(10(a). The Supreme Court has read the statutory language to extend standing no further than the normal reach of fourth amendment standing. *Alderman,* 394 U.S. at 175–76 n. 9, 89 S.Ct. at 967–68 n. 9; *see United States v. King,* 478 F.2d 494, 506 (9th Cir.) (defendant may move to suppress wiretap only if his conversation was intercepted, or if conversation occurred on his premises), *cert. denied,* 414 U.S. 846, 94 S.Ct. 111, 38 L.Ed.2d 94 (1973), 417 U.S. 920, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974). It can be argued by analogy that Taketa's appearance on the tape gave him standing in the same way an aural interception of his phone call to O'Brien would have done. In importing Title III case law into the area of video surveillance, however, we are mindful of the fact that Congress has not spoken on the issue, and that no importation of Title III doctrine into an area still governed solely by fourth amendment case law may alter existing fourth amendment law. *See Torres,* 751 F.2d at 885.

No circuit or district court has yet considered video surveillance in terms of fourth amendment standing. One case concerned a person filmed in his own home. *Cuevas–Sanchez,* 821 F.2d at 250. Two others involved coconspirators filmed in terrorist safe houses, *Torres,* 751 F.2d at 877, and in a business office. *Biasucci,* 786 F.2d at 507. In *Torres* and *Biasucci,* the courts apparently assumed implicitly that all persons filmed had fourth amendment standing.

One recent state case has considered the issue. *Ricks v. State,* 312 Md. 11, 537 A.2d 612, 618–20, *cert. denied,* 488 U.S. 832, 109 S.Ct. 90, 102 L.Ed.2d 66 (1988). In *Ricks,* the Court of Appeals of Maryland addressed the constitutionality of a warrant for video surveillance of an apartment. Several visitors were caught on film. The court's discussion of fourth amendment standing focused upon the defendants' relationship to the place searched, especially their possible status as invitees. While stating that "mere presence in another's apartment, without more, [does not] establish a legitimate expectation of privacy," the court found "more than mere presence" arguably to be shown. 537 A.2d at 620. The court thus assumed that the defendants had standing to challenge the warrant, but it did not need to decide the question because it held that the warrant met the requirements of the fourth amendment. *Id.* at 620–21.

We must return to basic principles of fourth amendment law to decide this case. In the oft-quoted words of *Katz,* "the Fourth Amendment protects people, not places." 389 U.S. at 351, 88 S.Ct. at 511. "[W]hat [a person] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Id.* at 351–52, 88 S.Ct. at 511. *Katz* does not mean that the location of an intrusion into privacy may never be considered; as our previous discussion of *Rakas* and other fourth amendment standing cases indicates, possessory rights may be of the utmost importance. *Katz* reminds us, however, that a determination that a person does not have a personal possessory interest in the location searched does not end the analysis. The court must consider, in all cases, whether the person searched had a subjective expectation of privacy, and whether that interest is one that society is prepared to recognize as reasonable.

The facts of *Katz* are not entirely dissimilar from our own. In *Katz,* the defendant occupied a public phone booth open to view. The Court held, however, that Katz had a reasonable expectation of privacy in the contents of his telephone calls. Here, Taketa has no general privacy interest in O'Brien's office, but he may have an expectation of privacy against being videotaped in it.

The exact details of Taketa's film appearance are not easy to discern from the transcript, because of defense counsel's successful objections to Agent MacVean's narration. What can be gleaned is the fact that Taketa appeared briefly in the camera's field of surveillance at some point on Sunday, May 18. No one else appeared in the tape filmed that day. Clearly, Taketa had a subjective expectation that he would not be on camera in his colleague's office at any time, and that he would not be disturbed by anyone on a Sunday in the small airport office. But we must continue on to the more difficult question of whether that expectation is objectively a legitimate one that society should find reasonable.

■■■■ Video surveillance does not in itself violate a reasonable expectation of privacy. Videotaping of suspects in public places, such as banks, does not violate the fourth amendment; the police may record what they normally may view with the naked eye. *See Sponick v. City of Detroit Police Dept.*, 49 Mich.App. 162, 211 N.W.2d 674, 690 (1973) (tavern a public place where videotaping suspect did not violate fourth amendment). Persons may create temporary zones of privacy within which they may not reasonably be videotaped, however, even when that zone is a place they do not own or normally control, and in which they might not be able reasonably to challenge a search at some other time or by some other means. *See People v. Dezek*, 107 Mich.App. 78, 308 N.W.2d 652, 654–55 (1981) (reasonable expectation of privacy from videotaping in restroom stalls).

The totality of the circumstances indicates that Taketa has a stronger claim to a reasonable expectation of privacy from video surveillance in O'Brien's office than he does to an expectation of privacy against an entry and manual search of that office. First, the video search was directed straight at him, rather than being a search of property he did not own or control. Second, he was of course present during the video search in question, while he was not

present when the agents entered and searched the office. Third, the silent, unblinking lens of the camera was intrusive in a way that no temporary search of the office could have been.

In assessing expectations of privacy, we may consider a number of factors. Property interest is one of them. *E.g., One 1977 Mercedes Benz*, 708 F.2d at 449. Although Taketa had no privacy interest in the office, he had an interest in his own person, the object observed by the surveillance. Any precautions taken to safeguard privacy are also of interest. *Id.* Here, although the evidence is not particularly compelling either way, it is noteworthy that Taketa was viewed in O'Brien's office at a time when other people would not normally be present. As noted before, the office was not open to the public. Taketa also exercised a certain dominion and control over the premises, at the time of his entry, that was not present when the agents' entry took place. *See Nadler*, 698 F.2d at 999.

We hold that Taketa had, under these facts, a reasonable privacy expectation that he would not be videotaped by government agents in O'Brien's office. We accept the proposition that a person filmed by government agents searching for evidence of crime, in a colleague's personal office in his place of business, has sufficient standing, by virtue of his appearance on the tape, to contest its admission on fourth amendment grounds. We base our holding expressly upon *Katz*, and upon our recognition of the exceptional intrusiveness of video surveillance. Our holding is limited to warrantless video surveillance for law enforcement reasons.[5]

For the reasons discussed *supra*, we find none of the exceptions to the warrant requirement applicable. Taketa has standing to contest the video search, and the video search was not authorized by a warrant based upon probable cause. We cannot find the admission of a videotape conclusively linking Taketa to illegal activity to be harmless error. Accordingly, we also

---

**5.** It does not necessarily apply to the different situation of a person filmed on another's premises when a valid search warrant has been issued for the surveillance.

reverse Taketa's conviction and remand his case.

We need not discuss the appellants' contention that the judge improperly commented upon the evidence, but note·that we do not find it meritorious.

### VI

Taketa does not have fourth amendment standing to challenge the initial warrantless search of O'Brien's office. O'Brien did have a reasonable expectation of privacy in his own office, but under the standards set forth in *O'Connor*, there was no fourth amendment violation.

The warrantless video taping of O'Brien's office, however, did violate the fourth amendment. No recognized exception to the warrant requirement excuses the DEA's videotaping without first obtaining a warrant based upon probable cause. The videotapes made by hidden camera should have been suppressed under the exclusionary rule. Although Taketa lacks fourth amendment standing to contest the initial search of O'Brien's office, he does have standing to challenge the video surveillance. The error was not harmless.

Both convictions are reversed, and the cases remanded for further proceedings consistent with this opinion.

REVERSED and REMANDED.